Jose PADILLA, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2011–CA–000553–MR.

Court of Appeals of Kentucky.

Sept. 28, 2012.

Timothy G. Arnold (argued), Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellant.

Jack Conway, Attorney General of Kentucky, Wm. Robert Long (argued), Jr., Assistant Attorney General, Frankfort, KY, for appellee.

Before DIXON, MOORE, and THOMPSON, Judges.

*OPINION*

THOMPSON, Judge:

Jose Padilla appeals from two orders of the Hardin Circuit Court denying his motions for RCr 11.42 and CR 60.02 relief after his case was remanded by the Kentucky Supreme Court for an evidentiary hearing following the United States Supreme Court's decision in *Padilla v. Kentucky,* —— U.S. ——, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). The sole issue presented is whether the circuit court erred when it found that Padilla did not demonstrate prejudice by his trial counsel's failure to provide proper advice concerning the immigration consequences of his guilty plea and denied his request for relief. After careful consideration of the United States Supreme Court's decision, we conclude that Padilla demonstrated that if he had been properly informed of the immigration consequences of his guilty plea, he would have insisted on going to trial and that his decision would have been rational under the circumstances.

## BACKGROUND

Padilla, a Honduras native, has been a lawful permanent resident of the United States for over forty years and served with honor as a member of the United States military during the Vietnam War. He resides in California with his wife, three disabled children and elderly mother-in-law. He has three adult children, one with his current wife, and two by a previous marriage. Since his arrival in the United States, he has spent only two weeks in Honduras.

In 2002, Padilla pleaded guilty to various marijuana-related charges, including trafficking in more than five pounds of marijuana. Pursuant to a plea agreement, he was sentenced to ten-years' incarceration, with five years to serve and five years probated. Because Padilla's trafficking crime is a deportable offense under 8 U.S.C.A. § 1227(a)(2)(b)(i), while in prison Padilla was served with an immigration detainer and, now released, faces deportation.

Prior to his release from prison, Padilla filed an RCr 11.42 motion requesting that his sentence be vacated because his trial counsel's misadvice concerning the immigration consequences of his plea constituted ineffective assistance of counsel in violation of his Sixth Amendment rights as pronounced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He further alleged that he would have insisted on going to trial if he had received correct advice from his trial counsel. Padilla requested an evidentiary hearing and appointment of counsel.

After the Hardin Circuit Court denied Padilla's RCr 11.42 motion without a hearing, Padilla appealed. This Court held that although collateral consequences do not have to be advised, counsel's erroneous advice · concerning immigration consequences could constitute ineffective assis-tance of counsel and remanded Padilla's case to the circuit court for an evidentiary hearing.

The Kentucky Supreme Court reversed, holding that misadvice regarding immigration consequences of a guilty plea was a collateral matter and, therefore, could not be the basis for an RCr 11.42 motion. The United States Supreme Court granted Padilla's petition for writ of certiorari.

## THE PADILLA DECISION

■ The Supreme Court reviewed Padilla's ineffective assistance of counsel claim under the ambit of the Sixth Amendment to the United States Constitution. As stated in *Strickland,* "the right to counsel is the right to effective assistance of counsel." *Strickland,* 466 U.S. at 668, 104 S.Ct. at 2063 (quoting *McMann v. Richardson,* 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 1449, n. 14, 25 L.Ed.2d 763 (1970)).

■ In the context of a guilty plea, the right to effective assistance of counsel is essential to a fair proceeding because the defendant forfeits many of the fundamental rights guaranteed by the Constitution. Recognizing that ninety-seven percent of federal convictions and ninety-four percent of state convictions result from guilty pleas, in *Missouri v. Frye,* —— U.S. ——, 132 S.Ct. 1399, 1407, 182 L.Ed.2d 379 (2012), the Supreme Court emphasized defense counsel's responsibilities during the plea process.

The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the ·criminal process at critical stages. Because ours is for the most part a system of pleas,

not a system of trials ... it is insufficient simply to point to the guarantee of a fair trial as a backstop that inoculates any errors in the pretrial process. To a large extent ... horse trading between prosecutor and defense counsel determines who goes to jail and for how long. That is what plea bargaining is. It is not some adjunct to the criminal justice system; it *is* the criminal justice system. Defendants who do take their case to trial and lose receive longer sentences than even Congress or the prosecutor might think appropriate, because the longer sentences exist on the books largely for bargaining purposes. This often results in individuals who accept a plea bargain receiving shorter sentences than other individuals who are less morally culpable but take a chance and go to trial. In today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant.

(internal quotations, citations and brackets omitted).

Despite the significance of effective assistance of counsel during the plea process, prior to *Padilla,* this Commonwealth held that the Sixth Amendment did not require that defense counsel advise a defendant of the deportation consequences of a guilty plea because such consequences were deemed "collateral" to the sentence. *Commonwealth v. Fuartado,* 170 S.W.3d 384 (Ky.2005). As noted by the *Padilla* Court, our Supreme Court was not alone in its view. *Padilla,* 130 S.Ct. at 1481 n. 9. Therefore, the Supreme Court accepted certiorari to decide, as a matter of federal law, whether Padilla's counsel had the obligation to advise Padilla that his guilty plea

would result in his mandatory deportation from this country.[1]

The Court rejected the view that there is a distinction between consequences of a guilty plea that are "direct" and those that are "collateral" in the context of immigration consequences. *Id.* at 1482. The Court explained that because under current immigration law deportation is nearly an automatic result for a broad class of noncitizen offenders, "accurate legal advice for noncitizens accused of crimes has never been more important." *Id.* at 1480. The Court recognized that deportation is not, in the strict sense, a criminal penalty, it is nevertheless a "severe penalty" inseparable from the conviction in the deportation context. *Id.* at 1481.

Although noting that Kentucky's plea form provides notice of possible immigration consequences, the Supreme Court held that Padilla's counsel had an obligation to advise him that the offense to which he pleaded guilty would result in deportation. In doing so, it reasoned:

> Deportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence. The collateral versus direct distinction is thus ill-suited to evaluating a *Strickland* claim concerning the specific risk of deportation. We conclude that advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel. *Strickland* applies to Padilla's claim.

*Id.* at 1482.

The Court then turned to the *Strickland* two-part test: (1) the performance prong—"whether counsel's representation fell below an objective standard of reason-

---

1. Because there is no debate that *Padilla* applies, we do not address whether the Court's

decision applies to a defendant who entered a plea prior to the date it was rendered.

ableness," and (2) the prejudice prong—
"whether there is a reasonable probability
that, but for counsel's unprofessional er-
rors, the result of the proceeding would
have been different." *Id.* at 1482 (quoting
*Strickland,* 466 U.S. at 694, 104 S.Ct. 2052
(internal quotations omitted)).

Addressing the first *Strickland* prong,
the Court concluded that Padilla sufficient-
ly alleged constitutional deficiency. *Id.* at
1483. The Court noted that "the terms of
the relevant immigration statute are suc-
cinct, clear, and explicit in defining the
removal consequence for Padilla's convic-
tion." *Id.* It described trial counsel's easy
task:

> Padilla's counsel could have easily deter-
> mined that his plea would make him
> eligible for deportation simply from
> reading the text of the statute, which
> addresses not some broad classification
> of crimes but specifically commands re-
> moval for all controlled substances con-
> victions except for the most trivial of
> marijuana possession offenses. Instead,
> Padilla's counsel provided him false as-
> surance that his conviction would not
> result in his removal from this country.
> This is not a hard case in which to find
> deficiency: The consequences of Padil-
> la's plea could easily be determined from
> reading the removal statute, his deporta-
> tion was presumptively mandatory, and
> his counsel's advice was incorrect.

*Id.* The court added that immigration laws
can be complex and when the law is not
succinct and straightforward, "a criminal
defense attorney need do no more than
advise a noncitizen client that pending
criminal charges may carry a risk of ad-
verse immigration consequences." *Id.*
However, in Padilla's case, the deportation
consequence was clear as was the duty to
give correct advice. *Id.*

The Court declined to limit *Strickland*
to the extent Padilla alleged affirmative

erroneous advice regarding immigration
consequences stating that "[i]t is quintes-
sentially the duty of counsel to provide her
client with available advice about an issue
like deportation and the failure to do so
clearly satisfies the first prong of the
*Strickland* analysis." *Id.* at 1484 (internal
quotation marks omitted). In conclusion,
the Court held:

> It is our responsibility under the Con-
> stitution to ensure that no criminal de-
> fendant—whether a citizen or not—is
> left to the mercies of incompetent coun-
> sel. To satisfy this responsibility, we
> now hold that counsel must inform her
> client whether his plea carries a risk of
> deportation. Our longstanding Sixth
> Amendment precedents, the seriousness
> of deportation as a consequence of a
> criminal plea, and the concomitant im-
> pact of deportation on families living
> lawfully in this country demand no less.

*Id.* at 1486 (internal quotation and citation
omitted).

The Court expressly refrained from de-
termining whether Padilla met the *Strick-
land* prejudice prong and remitted that
issue to the Kentucky courts. *Padilla,* 130
S.Ct. at 1483–84. However, in response to
the Solicitor General's concern that its de-
cision would open the "floodgates" to va-
cating guilty pleas, the Court stressed that
meeting Strickland's "high bar is never an
easy task." *Id.* at 1485. Citing its deci-
sion in *Roe v. Flores–Ortega,* 528 U.S. 470,
480, 486, 120 S.Ct. 1029, 145 L.Ed.2d 985
(2000), it emphasized that even if the first
*Strickland* prong is met, the defendant
must "convince the court that a decision to
reject the plea bargain would have been
rational under the circumstances." *Id.*

## PROCEEDINGS ON REMAND

On remand, the Commonwealth con-
ceded that Padilla's trial counsel errone-
ously advised Padilla regarding the immi-

gration consequences of his guilty plea and that his misadvice constituted ineffective assistance of counsel. Although not an issue, the circuit court specifically found that Padilla had not been correctly advised and had satisfied the first *Strickland* prong. Therefore, our concern is with the second *Strickland* prong, and the evidence presented to establish that Padilla's decision to reject the plea offer and insist on a trial would have been rational under the circumstances.

The circuit court considered evidence concerning the circumstances of Padilla's arrest presented at a previous suppression hearing and at the RCr 11.42 hearing. Because the circuit court heavily relied on the evidence of Padilla's guilt, we describe the circumstances of his arrest.

In 2001, Padilla was at an Interstate 65 weigh station in Hardin County when an inspector noticed that Padilla did not have a KYU number and appeared nervous. The inspector also observed that Padilla was "off route." During a consensual search of the truck cab, marijuana and drug paraphernalia were found and Padilla was arrested.

Upon opening the tractor-trailer truck's doors, a box fell and tore. The police contend that the box revealed only a white styrofoam inner package while Padilla contends that drugs were plainly visible. According to Padilla, after the drugs were visible, he was asked what was in the load and responded "maybe, drugs." The police contend that the question was asked and answered before the drugs were visible. It is not disputed that a search of the truck revealed a substantial quantity of marijuana.

Padilla testified that he had no knowledge that he was transporting boxes of marijuana until the search. He explained that he was a self-employed tractor-trailer owner and obtained loads through several brokers. He had no right to inspect the load's contents and checked only for its quantity and weight. On the date of his arrest, he testified that he believed he was transporting a partial load of Nestle chocolates from California to Illinois and a second partial load of dehydrated abalone from California to Detroit. Although he had not planned on traveling through Kentucky, during his trip the tractor-trailer began to have axle problems and he took a Kentucky route because it was less hilly than his planned route. He testified that he had not checked Kentucky's road tax procedures.

Padilla testified that he pleaded guilty only because his wife, Ingrid, and daughter, Yoshii, were distraught over his potential prison sentence. Although he had previously rejected a similar plea agreement, on the day of trial he accepted. He testified that he was completely unaware that he would be deported and had been told by his trial counsel that deportation was not an issue because of his long-term residency in the United States. When asked if he would have pleaded guilty if he had been properly informed that he would be deported, Padilla responded that he would have insisted on a trial because deportation was the same as "putting a gun" to his head.

Trial counsel testified that he believed from the beginning of his representation that Padilla was an illegal alien and not a legal permanent resident. He further believed that because Padilla was a veteran who had lived in the United States for over forty years, he would not be deported. Although he could not specifically recall speaking with Padilla's wife or daughter regarding Padilla's possible deportation, he recalled attending a seminar regarding deportation consequences and consulting with an immigration attorney. He testified that he believed the evidence against Pa-

dilla was strong and that he would not have succeeded at trial.

Testimony was also heard from Ingrid and Yoshii. Ingrid testified that she spoke to Padilla's trial counsel regarding Padilla's possible deportation and he informed her that deportation was not an issue because of Padilla's military service and he had lived in the United States for over forty years. She testified that on the trial date, Padilla's trial counsel urged her to persuade Padilla to accept the plea offer. Ingrid agreed to do so because she understood that Padilla would not be deported and would be eligible for parole. If she had been informed that Padilla would be deported, she would have advised him to reject the offer.

Yoshii also testified that there was no discussion indicating that Padilla would be deported. She stated that prior to accepting the plea offer, her father maintained he was innocent and insisted on a trial. She testified that if she had been informed that Padilla would be deported, she would have insisted that he go to trial.

In an extensive opinion and order, the circuit court focused on whether Padilla's decision to insist on a trial would have been "rational." The court concluded that there was such strong evidence of guilt, Padilla's choice would not have been rational and stated its reasoning:

> A rational defendant facing trial with an overwhelming likelihood of conviction will try to mitigate the negative consequences. Regardless of the particular importance that might attach to deportation, it would be mandatory on conviction of an aggravated felony, as in this case. The only negotiable matter was the length of sentence, and this plea offered Padilla the minimum of five years to serve with remainder probated. A rational defendant would not have

risked a sentence of ten years by insisting on going to trial in this case.

Having found that Padilla did not suffer actual prejudice by counsel's ineffective assistance, the circuit court denied Padilla's RCr 11.42 motion and, on the same basis, his CR 60.02 motion.

## ANALYSIS

■ Although *Strickland* remains the seminal case regarding ineffective assistance of counsel claims, the prejudice inquiry has been necessarily modified in the context of a guilty plea challenge. The proper inquiry is whether "there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). It is insufficient to merely state that with different advice, the movant would not have insisted on going to trial. "The test is objective, not subjective[.]" *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir.2012). A reasonable probability exists if the defendant convinces the court "that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla*, 130 S.Ct. at 1485. This standard of proof is "somewhat lower" than the common "preponderance of the evidence" standard. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

■ In challenging his guilty plea based upon ineffective assistance of counsel, Padilla had to demonstrate that his counsel's ineffective performance affected the outcome of the *plea process*. *Hill*, 474 U.S. at 59, 106 S.Ct. at 370. Stated differently, Padilla had to demonstrate that he rationally would have insisted on a trial, not that an acquittal at trial was likely. The Supreme Court has "never required an affirmative demonstration of likely acquittal at such a trial as the *sine qua non* of preju-

dice." *United States v. Orocio,* 645 F.3d 630, 643 (3rd Cir.2011).

█ Whether prejudice has been demonstrated under *Strickland* depends on the facts of a particular case. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have rejected the plea offer and insisted on going to trial. *Id.* (citing *Roe,* 528 U.S. at 480–481, 120 S.Ct. at 1036–1037 (2000)).

█ The evidence of guilt and the potential sentence if convicted at trial compared to the consequences of a guilty plea are factors to be considered and, for a citizen defendant, may be the determinative factors in deciding to accept a plea offer. However, for a noncitizen defendant and, particularly a legal permanent resident facing deportation, the "stakes are . . . high and momentous." *Delgadillo v. Carmichael,* 332 U.S. 388, 391, 68 S.Ct. 10, 12, 92 L.Ed. 17 (1947). It is the "equivalent of banishment or exile." *Id.* In *Padilla,* the Court stressed that preserving the noncitizen defendant's right to remain in the United States "may be more important to the [defendant] than any jail sentence." *Padilla,* 130 S.Ct. at 1483 (quoting *I.N.S. v. St. Cyr,* 533 U.S. 289, 322–323, 121 S.Ct. 2271, 2291, 150 L.Ed.2d 347 (2001)).

█ In *Orocio,* the Third Circuit echoed the Supreme Court's emphasis on the importance of preserving a legal permanent resident's right to remain in this country. Even when the chance of acquittal is slight, the decision to go to trial can be a rational choice.

For the [noncitizen] defendant most concerned with remaining in the United States, especially a legal permanent res-

ident, it is not at all unreasonable to go to trial and risk a ten-year sentence and guaranteed removal, but with the chance of acquittal and the right to remain in the United States, instead of pleading guilty to an offense that, while not an aggravated felony, carries "presumptively mandatory" removal consequences. Just as the threat of [removal] may provide the defendant with a powerful incentive to plead guilty to an offense that does not mandate that penalty in exchange for a dismissal of a charge that does the threat of removal provides an equally powerful incentive to go to trial if a plea would result in removal anyway.

*Orocio,* 645 F.3d at 645 (internal quotations and citations omitted). Likewise, we conclude that although not the exclusive factor when determining whether a particular defendant's decision to insist on a trial would have been rational, the immigration consequences of a guilty plea can be the predominate factor. *See Padilla,* 130 S.Ct. at 1483.

The court must determine whether the defendant's rejection of the plea offer would have been a rational choice, even if not the best choice. Necessarily, the court must consider the importance a particular defendant places upon preserving his or her right to remain in this country.[2] A noncitizen defendant with significant ties to this country may rationally be willing to take the risk of a trial while the same decision by one who has resided in the United States for a relatively brief period of time or has no family or employment in this country may be irrational.

Padilla left Honduras as a teenager and, except for a two week visit, has never returned. He is now fifty years old, a

**2.** We reiterate that Padilla is a legal permanent resident and was not deportable prior to entering his plea.

lawful permanent resident of the United States, and has resided in this country for over four decades. He is a self-employed truck driver providing support for his wife and three disabled children, who are citizens of this country. Additionally, he has three adult children in this country. At the RCr 11.42 hearing, he testified that pleading guilty and facing certain deportation was essentially "putting a gun" to his head and, if he had known of the deportation consequences, he would have insisted on going to trial. Padilla's wife and daughter confirmed that Padilla's banishment from this country was a death sentence for their life as a family.

Although the evidence against Padilla is strong, it is far from conclusive. A reasonable jury could find that Padilla was unaware that the load he transported contained marijuana and acquit him of the deportable offense.[3] Padilla testified that he had no right to inspect the contents of the load he transported and was unaware that he was transporting marijuana. Under the facts, it would be reasonable for counsel to argue to a jury that Padilla's actions were inconsistent with a person who had knowledge of the load's contents. Arguably, had he known, he would have paid Kentucky's road taxes to avoid an investigative stop and possible search. Moreover, a reasonable juror could conclude that if Padilla was aware of the substantial amount of marijuana he was transporting, he would have placed it securely in the front of the trailer behind the legal load he transported, instead of the rear where it would be revealed merely upon opening the trailer's doors.

Finally, Padilla's plea bargain was not as favorable as he believed. Although, if tried and convicted, he faced a maximum of ten-years' incarceration, under the plea agreement he was sentenced to ten-years' imprisonment, with five years to serve and five years probated. Based on the testimony at the RCr 11.42 hearing, Padilla accepted the offer on the day of trial only because he believed he would be not be deported and released on parole. However, Padilla would later learn that he faced deportation, was not eligible for parole, and was required to serve his entire sentence.

Accepting the plea agreement rendered Padilla mandatorily deportable. If he had insisted on a trial, the Commonwealth would have had to prove his guilt beyond a reasonable doubt, and Padilla would have a chance of avoiding a conviction that subjected him to mandatory deportation. Moreover, had the immigration consequences of Padilla's plea been factored into the plea bargaining process, trial counsel may have obtained a plea agreement that would not have the consequence of mandatory deportation. *Padilla*, 130 S.Ct. at 1486. In light of Padilla's particular circumstances, taking such a chance would have been rational.

There was substantial evidence that had Padilla been properly informed that if he pleaded guilty he faced mandatory deportation, he would have insisted on going to trial. Under the circumstances, his decision would have been rational. Because we are vacating Padilla's conviction, he can be tried and, if convicted, faces the maximum sentence and deportation. However, for Padilla, exile is a far worst prospect than the maximum ten year sentence.

For the forgoing reasons, the case is remanded to the Hardin Circuit Court for

---

3. To be found guilty of trafficking, a jury would have to find that Padilla knowingly trafficked in marijuana. KRS 218A.1421.

an order vacating Padilla's judgment and conviction.

ALL CONCUR.